UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE CLEMENTINE COMPANY LLC. d/b/a THE
THEATER CENTER, PLAYERS THEATER
MANAGEMENT CORP. d/b/a THE PLAYERS THEATER,
WEST END ARTISTS COMPANY d/b/a THE ACTORS
TEMPLE, SOHO PLAYHOUSE INC. d/b/a SOHO
PLAYHOUSE, THE GENE FRANKEL THEATRE LLC.,
TRIAD PROSCENIUM PARTNERS INC. d/b/a THE
TRIAD, CARAL LTD. d/b/a BROADWAY COMEDY
CLUB, and DO YOU LIKE COMEDY LLC. d/b/a NEW
YORK COMEDY CLUB,

                                        Plaintiffs,          No. 20-cv-8899 (CM)

                    v.

ANDREW M. CUOMO, in his Official Capacity as Governor
of the State of New York, ATTORNEY GENERAL OF THE
STATE OF NEW YORK, BILL de BLASIO, in his Official
Capacity as Mayor of the City of New York, and THE STATE
OF NEW YORK,

                                        Defendants.

## STATE DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

LETITIA JAMES
Attorney General
State of New York
*Attorney for the State Defendants*
28 Liberty Street
New York, NY 10005
Tel. (212) 416-8610
Matthew.Conrad@ag.ny.gov

Matthew L. Conrad
Assistant Attorney General
*Of Counsel*

## **Table of Contents**

PRELIMINARY STATEMENT ...............................................................................................1

STATEMENT OF FACTS ...................................................................................................3

    A.  The COVID-19 Pandemic and the State's Response.....................................................4

    B.  New York State's Phased Reopening and Current Permissible Operations.................5

    C.  Theaters Pose Particular Risks of Hosting COVID-19 "Superspreader" Events .........6

STANDARD OF REVIEW ...................................................................................................7

ARGUMENT ......................................................................................................................8

    I.  PLAINTIFFS HAVE NO CLEAR OR SUBSTANTIAL LIKELIHOOD OF SUCCESS
       ON THE MERITS ...................................................................................................8

    II.  THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST STRONGLY
       FAVOR DEFENDANTS......................................................................................14

    III. PLAINTIFFS HAVE NOT SHOWN IRREPERABLE HARM ......................................16

CONCLUSION..................................................................................................................17

## Table of Authorities

**Cases**                                                                                    **Pages**

Agudath Israel of America et al v. Cuomo,
   2020 WL 6559473 (2d Cir. Nov. 9, 2020) ............................................................................ 11

Agudath Israel of America et al v. Cuomo,
   No. 20-cv-4834 (E.D.N.Y.) ...................................................................................................... 10

Ass'n of Jewish Camp Operators v. Cuomo,
   2020 WL 3766496 (N.D.N.Y. July 6, 2020) ............................................................................ 9

Beal v. Stern,
   184 F.3d 117 (2d Cir. 1999) ...................................................................................................... 8

Borey v. National Union Fire Ins. Co. of Pittsburgh, Pennsylvania,
   934 F.2d 30 (2d Cir. 1991) ...................................................................................................... 17

Columbus Ale House, Inc. v. Cuomo,
   2020 WL 6118822 (E.D.N.Y. Oct. 16, 2020) ........................................................................ 10

Doe v. N.Y.U.,
   666 F.2d 761 (2d Cir. 1981) ...................................................................................................... 8

eBay, Inc. v. MercExchange,
   547 U.S. 388 (2006) ................................................................................................................ 15

Fortress Bible Church v. Feiner,
   694 F.3d 208 (2d Cir. 2012) .................................................................................................... 12

Geller v. Cuomo,
   2020 WL 4463207 (S.D.N.Y. Aug. 3, 2020) ............................................................................ 9

Jacobson v. Commonwealth of Massachusetts,
   197 U.S. 11 (1905) ................................................................................................................. 2, 9

L&M Bus Corp. v. Bd. of Educ. of City Sch. Dist. of City of N.Y.,
   2018 WL 2390125 (E.D.N.Y. May 25, 2018) .......................................................................... 7

Luke's Catering Service, LLC v. Cuomo,
   No. 20 Civ. 1086S, 2020 WL 5425008 (W.D.N.Y. Sept. 10, 2020) ................................. 10, 17

Make the Rd. New York v. Cuccinelli,
   419 F. Supp. 3d 647 (S.D.N.Y. 2019) .................................................................................... 14

Maryland v. King,
   567 U.S. 1301 (2012) .............................................................................................................. 17

Million Youth March, Inc. v. Safir,
    155 F.3d 124 (2d Cir. 1998)..................................................................................... 15

Murray v. Cuomo,
    460 F. Supp. 3d 430 (S.D.N.Y. 2020)..................................................................... 15

New York State Rifle & Pistol Ass'n v. City of N.Y.,
    86 F. Supp. 3d 249 (S.D.N.Y. 2015)....................................................................... 15

Nken v. Holder,
    556 U.S. 418 (2009).............................................................................................. 7, 14

Otoe-Missouria Tribe v. New York State Dep't of Fin. Svcs.,
    769 F.3d 105 (2d Cir. 2014).................................................................................... 14

Pappas v. Town of Enfield,
    602 F. App'x 35 (2d Cir. 2015) .................................................................. 11, 12, 13

People ex. rel. Schneiderman v. Actavis PLLC,
    787 F.3d 638 (2d Cir. 2015)...................................................................................... 8

Prestopnik v. Whelan,
    249 F. App'x 210 (2d Cir. 2007) .................................................................... 11, 13

Rodriguez v. DeBuono,
    175 F.3d 227 (2d Cir.1999)..................................................................................... 16

Roman Catholic Diocese of Brooklyn, New York v. Cuomo,
    2020 WL 6120167 (E.D.N.Y. Oct. 16, 2020)......................................................... 11

Salinger v. Colting,
    607 F.3d 68 (2d Cir. 2010)..................................................................................... 15

Shapiro v. Cadman Towers, Inc.,
    51 F.3d 328 (2d Cir.1995)....................................................................................... 16

South Bay Pentecostal Church v. Newsom,
    140 S.Ct. 1613 (2020).............................................................................................. 9

Vill. of Willowbrook v. Olech,
    528 U.S. 562 (2000)................................................................................................ 11

Weinberger v. Romero–Barcelo,
    456 U.S. 305 (1982)) .............................................................................................. 15

Winter v. Natural Res. Defense Council, Inc.,
    555 U.S. 7 (2008)......................................................................................... 7, 14, 15

iv

Defendants Andrew M. Cuomo, in his official capacity as Governor of the State of New York, Letitia James, in her official capacity as Attorney General of the State of New York, and the State of New York (collectively, the "State Defendants"), respectfully submit this memorandum of law, together with the Declaration of Dr. Debra S. Blog ("Blog Decl.") and the accompanying exhibits, in opposition to Plaintiffs' motion for a preliminary injunction dated November 9, 2020 (ECF No. 9).

## PRELIMINARY STATEMENT

The State of New York is in a pivotal stage in its continuing fight against the greatest public health crisis in living memory. The COVID-19 pandemic has caused tens of thousands of deaths in New York State, an enormous number that could have been far higher.  The State has taken urgent action to halt the spread of the virus by enacting temporary restrictions on the riskiest types of businesses and social gatherings, balancing the lives, health, and safety of its citizens with the need to protect their livelihoods. These measures permitted the State to achieve one of the country's lowest infection rates and to enact a gradual, phased reopening process over much of the past few months. However, a resurgence in cases has begun across the nation and the world, and infection and death rates are skyrocketing globally. New York is not immune from this renewed surge of the virus, and the lessons of the early days of the pandemic are clear. Continued action to limit high-risk activity is necessary to ensure that the State does not return to the infection and hospitalization rates seen during March and April of this year. The State's coordinated plan to carefully and safely reopen businesses and schools, and to resume other activities of daily life, must continue and should not be enjoined or frustrated.

Plaintiffs in this lawsuit seek to overturn a key component of the State's efforts to avoid one category of non-essential "superspreader" events. Plaintiffs are a group of self-described

"small theaters" – seven performance venues that claim to have capacity of 199 seats or less. Pursuant to a series of Executive Orders ("EOs") and related guidance issued by Governor Cuomo and various state agencies (collectively, the "State Guidance"), Plaintiffs' venues have not been permitted to operate since March 16, 2020. While some type of public spaces and activities are safer and have been permitted to resume limited operations, others – including live performance indoor theaters – are not. In contrast to other types of venues, where small groups enter and leave at different times, a key feature of theaters is that crowds enter and leave all at once. A key factor is the congregating and mingling in queues to enter the venue before the event begins. Social distancing is hard to maintain and difficult to enforce. Additionally, the theatrical activities of singing, projecting one's voice, and loudly speaking increases the risk of viral spread. As a result, theatrical performances, comedy shows, and similar events with live performers remain prohibited under New York State's reopening plan due to the particularized public health dangers inherent to such events.

In seeking a preliminary injunction exempting them from the provisions of the State Guidance and permitting them to resume operations, Plaintiffs seeks to advance a single claim: that the State Guidance violates their rights under the Equal Protection Clause of the U.S. Constitution, under a "class of one" theory. However, Plaintiffs are not entitled to such extraordinary relief, as they cannot satisfy any of the requirements of the preliminary injunction inquiry.

Most notably, they fail to demonstrate a strong likelihood of success on the merits. (Point I.) As an initial matter, this Court's analysis should be informed by the deferential standards set out in Jacobson v. Commonwealth of Massachusetts, 197 U.S. 11 (1905), the leading case regarding a state's latitude to protect its citizens during a public health emergency. Plaintiffs cannot

establish the existence of materially similar comparable businesses that have been treated differently. Even if there were such a comparator, Plaintiffs cannot show that the purported difference in treatment was of a nature that suggests that Plaintiffs were improperly targeted for such treatment. Plaintiffs similarly fail to show that the requested injunction is in the public interest, (Point II), or that they have established they would suffer irreparable harm absent an injunction (Point III). As such, in view of the ongoing public health emergency, and with the deference that federal courts afford to state governments to enable them to address such a crisis, Plaintiffs cannot meet their high burden of establishing any of the elements required for this extraordinary relief.

## <u>STATEMENT OF FACTS</u>

The ongoing COVID-19 pandemic has, to date, caused tens of thousands of deaths in New York State and hundreds of thousands of deaths worldwide. New York was, for much of this spring, the global epicenter of the crisis.[1] Thanks to the lifesaving efforts of medical professionals, essential workers, state and local governments, and New York's citizens who have heeded calls to shelter-in-place and practice social distancing, New York's daily death toll was reduced from a peak of approximately 800 per day to, for a time, less than 10 per day.[2] The threat remains, however, and in recent weeks has accelerated to concerning levels not seen for several months. The United States alone has recently recorded over 160,000 known cases in a single day.[3] Infection

---

[1] <u>See</u> New York Times, <u>New York City Region Is Now an Epicenter of the Coronavirus Pandemic</u> (March 22, 2020),   https://www.nytimes.com/2020/03/22/nyregion/Coronavirus-new-York-epicenter.html.

[2] <u>See</u> New York, COVID Tracking Project,   https://covidtracking.com/data/state/new-york#historical.

[3] <u>See</u> New York Times, <u>The U.S. again broke records for new cases — more than 160,000 — and hospitalizations.</u> (November 12, 2020),
https://www.nytimes.com/live/2020/11/12/world/covid-19-coronavirus-updates/the-us-again-

and death rates in New York have sharply increased in recent weeks as well, but so far the State has avoided returning to the peak of the crisis that it suffered through in March and April. Continued vigilance is necessary to prevent this recent resurgence of the pandemic from causing the illness and death that New Yorkers have already once been subjected to, and to prevent additional extensive shutdowns of schools and businesses. <u>See generally</u> Blog Decl. ¶¶ 74-84 (providing background regarding the COVID-19 pandemic and its effects on New York State). For example, on November 11, 2020, Governor Cuomo announced a statewide curfew of 10 p.m. on all restaurants, taverns, and liquor stores. <u>See</u> Executive Order 202.74.[4]

### A. The COVID-19 Pandemic and the State's Response

On March 7, 2020, to combat the burgeoning COVID-19 pandemic, pursuant to New York State Executive Law § 29, Governor Cuomo issued Executive Order ("EO") 202, implementing the State Comprehensive Emergency Management Plan and declaring a statewide disaster emergency.[5] By EO 202, the Governor suspended all state and local laws, rules, and regulations to the extent necessary to cope with the COVID-19 disaster emergency. <u>Id.</u> Following the issuance of EO 202, Governor Cuomo issued  supplemental EOs, continuing the temporary suspension and modification of certain laws relating to the state of emergency.[6]

As relevant here, on March 16, 2020, by EO 202.3, gatherings in excess of 50 people were prohibited. On-premises service of food and beverages in all bars and restaurants was indefinitely suspended and gambling establishments, gyms, and movie theaters were indefinitely closed. Large gatherings or events, including "performances before a large audience," were required to be

---

broke-records-for-new-cases-more-than-160000-and-hospitalizations,

[4] https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.74_new.pdf.

[5] https://www.governor.ny.gov/news/no-202-declaring-disaster-emergency-state-new-york

[6] https://www.governor.ny.gov/executiveorders

cancelled or postponed "if more than fifty persons are expected in attendance." Blog Decl. ¶ 34, Ex. P. On March 20, 2020, Governor Cuomo announced the "New York State on PAUSE" initiative, which, *inter alia*, required the closure of all non-essential businesses statewide and prohibited non-essential gatherings of individuals of any size for any reason. Blog Decl. ¶¶ 43-46. Executive Order 202.6 listed what businesses and services in New York State were deemed "essential" and directed the Empire State Development Corporation ("ESDC"), a New York State public-benefit corporation, to issue guidance to further clarify which businesses would be considered "essential" or "non-essential." Blog Decl. ¶¶ 38-39, Ex. T.  On March 23, 2020, by EO 202.10, the Governor barred all non-essential gatherings of any size. Blog Decl. ¶¶ 46, Ex. W. ESDC subsequently issued guidance identifying businesses designated as non-essential, which specifically listed "event venues, including but not limited to establishments that host concerts, conferences, or other in-person performances or presentations in front of an in-person audience" as among those businesses that must remain closed. Blog Decl. ¶¶ 38-39, Ex. T.

### B.  New York State's Phased Reopening and Current Permissible Operations

Over May and June, as the State's infection and death rates began to stabilize and then decline, Governor Cuomo issued additional EOs permitting non-essential gatherings for any lawful purpose of increasing numbers of people, culminating in the permissibility of social gatherings of up to 50 people as of June 15, 2020. Blog Decl. ¶ 52, Ex. CC.[7] Alongside these changes, New York transitioned from the "New York on PAUSE" initiative to the "New York Forward" initiative, a phased plan to guide the reopening of non-essential businesses. Blog Decl. ¶ 49, Ex. Z.

---

[7] As COVID-19 cases have surged again in recent weeks, as of November 13, 2020, the 50-person gathering limit has been reduced to 10 people.
https://www.governor.ny.gov/news/governor-cuomo-announces-restaurants-bars-other-sla-licensed-entities-must-close-person-service.

On June 26, 2020, Governor Cuomo issued EO 202.45, which permitted low-risk indoor and outdoor entertainment to reopen in areas that had reached Phase 4 of the New York Forward initiative, provided that such businesses follow New York State Department of Health ("DOH") guidance. Blog Decl. ¶ 52, Ex. CC. DOH subsequently released guidance documents elaborating on this directive, including defining what constitutes permitted "low-risk" indoor and outdoor entertainment. Theaters were not included in the definition of "low risk" entertainment. Rather, the Phase 4 guidance clarified that "performing arts [and] other theatrical productions" were a "higher-risk" activity that remained prohibited under New York's reopening plan. Blog Decl. ¶ 55, Ex. EE. Since that time, certain non-essential activities have been permitted to reopen, including bowling alleys, casinos, shopping malls, and movie theaters outside of New York City. Theaters and other performance venues, however, have not yet been deemed safe to reopen.

## C.    Theaters Pose Particular Risks of Hosting COVID-19 "Superspreader" Events

Theaters are particularly risky operations with respect to the spread of COVID-19. They involve gatherings or crowds, with common arrival, seating, viewing, and departure times. Blog Decl. ¶¶ 86, 89. They generally last for a longer period of time than activities such as dining, and attendees often linger after the performance is finished. Blog Decl. ¶¶ 89, 95, 124. Moreover, performances inherently involve those on stage engaging in activities such as singing, yelling, loudly speaking, and otherwise projecting their voices at each other and into the audience. COVID-19 readily spreads through respiratory aerosols and droplets, and thus even a single infected performer could efficiently spread COVID-19 among other performers and the audience. Blog Decl. ¶¶ 14, 23, 96, 103, 104, Exs. G, H, J, K. While air filtration and air cleaners may reduce this risk, they are not, on their own, sufficient to protect attendees and performers from aerosol spread.[8]

---

[8]    https://www.epa.gov/coronavirus/air-cleaners-hvac-filters-and-coronavirus-covid-19   ("When

Musical performances, comedy performances, and other similar events therefore pose an increased risk of acting as a "superspreader" event. Superspreader incidents – in which one person infects a disproportionate number of other individuals – have played a substantial role in the transmission of the coronavirus that causes COVID-19. Blog Decl. ¶¶ 17-18, Exs. J, K. Superspreading events tend to occur in indoor spaces with people in close proximity, Blog Decl. ¶¶ 17-18, and the risk appears to be higher if people are raising their voices in some way, such as singing or shouting. Blog Decl. ¶¶ 23, 103.

## STANDARD OF REVIEW

A preliminary injunction is "an extraordinary remedy never awarded as of right." Winter v. Natural Res. Defense Council, Inc., 555 U.S. 7, 24 (2008). Plaintiffs bear the burden of establishing that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. Winter, 555 U.S. at 20. The final two factors – the balance of the equities and the public interest – "merge when the Government is the opposing party." L&M Bus Corp. v. Bd. of Educ. of City Sch. Dist. of City of N.Y., No. 18 Civ. 1902, 2018 WL 2390125, at *13 (E.D.N.Y. May 25, 2018) (quoting Nken v. Holder, 556 U.S. 418, 435 (2009)).

In addition, the movant is held "to a heightened standard" where, as here: (i) an injunction is "mandatory" (i.e., altering the status quo rather than maintaining it) or (ii) the injunction "will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits." People ex. rel. Schneiderman v. Actavis PLLC, 787

---

used properly, air cleaners and HVAC filters can help reduce airborne contaminants including viruses in a building or small space. By itself, air cleaning or filtration is not enough to protect people from exposure to the virus that causes COVID-19. When used along with other best practices recommended by CDC and others, filtration can be part of a plan to reduce the potential for airborne transmission of COVID-19 indoors.)

F.3d 638, 650 (2d Cir. 2015). In such cases, the movant must show a "clear" or "substantial" likelihood of success on the merits, in addition to showing that the preliminary injunction is in the public interest. Id. (quoting Beal v. Stern, 184 F.3d 117, 123 (2d Cir. 1999) and Doe v. N.Y.U., 666 F.2d 761, 773 (2d Cir. 1981)). Plaintiffs cannot meet this heightened standard.

## ARGUMENT

### I.  PLAINTIFFS HAVE NO CLEAR OR SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

Plaintiffs fail to demonstrate that they have any likelihood of success on the merits, much less a likelihood of  "clear or substantial" success. As an initial matter, Plaintiffs' only argument in support of a preliminary injunction is that the State Guidance violates the Equal Protection Clause of the U.S. Constitution, under a "class of one" theory. In their Complaint, Plaintiffs also allege violations of substantive and procedural due process, as well as New York State law equal protection. They also offhandedly reference a possible Fifth Amendment takings argument (Compl. ¶ 3, ECF No. 1), but do not include it in their claims for relief. However, in the present motion, the only claim for which Plaintiffs assert a likelihood of success on the merits is their federal equal protection claim. As such, that is the only theory that need be addressed by the State Defendants – although the State Defendants assert that their motion would nevertheless fail on those alternative claims as well.  Moreover, Plaintiffs have provided no reason or grounds why the Attorney General is named as a defendant or what, if any, relief is being sought against her.

### A.  The Jacobson Standard

Plaintiffs cannot show a clear likelihood of success on their equal protection claim.  At the outset, the question of whether the State Guidance constitutes a violation of Plaintiffs' constitutional rights must be viewed through the lens of the State's overriding interest in protecting New Yorkers from the ongoing pandemic and in deference to the difficult choices that the State

must make in doing so. The Court must be guided by <u>Jacobson v. Commonwealth of</u> <u>Massachusetts</u>, 197 U.S. 11 (1905), the seminal case regarding a state's ability to exercise its police powers to protect its citizens from a public health emergency. <u>Jacobson</u> upheld a mandatory vaccination statute to protect against smallpox. The case stands for the proposition that "'a community has the right to protect itself against an epidemic of disease which threatens its members,' and that in such times judicial review is reserved for a measure that 'has no real or substantial relation' to the object of public health or is 'beyond all question, a plain, palpable invasion of rights secured by the fundamental law.'" <u>Geller v. Cuomo</u>, No. 20 Civ. 4653, 2020 WL 4463207, at *10 (S.D.N.Y. Aug. 3, 2020) (upholding New York's prohibition of non-essential public gatherings of over 50 people), <u>quoting</u> <u>Jacobson</u>, 197 U.S. at 10.

Chief Justice Roberts emphasized the salience of <u>Jacobson</u> to state governments' responses to the COVID-19 public health crisis, and explained that federal courts should be highly deferential to the decisions of state leaders made in pursuit of public health during this time. <u>See</u> <u>Geller</u>, 2020 WL 4463207, at *10 (S.D.N.Y. Aug. 3, 2020) ("Under these circumstances, the Chief Justice's words in <u>South Bay [United] Pentecostal Church v. Newsom</u> seem particularly fitting herein: public officials responding to a public health crisis must be afforded especially broad latitude, such that they should not be open to 'second-guessing' by an 'unelected federal judiciary which lacks the background, competence, and expertise to assess public health and is not accountable to the people." <u>Geller</u>, 2020 WL 4463207, at *10 (citing <u>South Bay United Pentecostal Church v.</u> <u>Newsom,</u> 140 S. Ct. 1613, 1613-14 (2020)); <u>see also</u> <u>Ass'n of Jewish Camp Operators v. Cuomo</u>, No. 20 Civ. 687, 2020 WL 3766496, at *8 (N.D.N.Y. July 6, 2020) ("the Court joins the many courts throughout the country that rely on <u>Jacobson</u> when determining if a governor's executive order has improperly curtailed an individual's constitutional right during the COVID-19

pandemic"); Columbus Ale House, Inc. v. Cuomo, No. 20 Civ. 4291, 2020 WL 6118822 (E.D.N.Y.

Oct. 16, 2020) (adopting Jacobson as the relevant standard in denying a preliminary injunction

against a directive requiring restaurants to close at midnight); Luke's Catering Service, LLC v.

Cuomo, No. 20 Civ. 1086S, 2020 WL 5425008, at *5-7 (W.D.N.Y. Sept. 10, 2020) (Decision and

Order applying Jacobson, denying a preliminary injunction and granting defendants' cross-motion

to dismiss, in a challenge to New York's 50-person limit on event and banquet venues).

 Plaintiffs make the conclusory assertion that Jacobson should not affect this Court's

analysis of their motion. Pl. Memo 16. To the contrary, given the tipping point at which the State

now stands – between a return to the widespread illness and death which transpired in March and

April or the relative safety and gradual economic reopening in the months since – the Jacobson

principle applies as strongly at this moment as it ever has. New York's rate of new cases has risen

from in the hundreds per day in September to currently over 5,000 per day and is sharply

increasing. Deaths have risen from single digits per day to dozens.[9] Under such fluid

circumstances, the State must have the flexibility to take steps to prevent a return to the peak of

the pandemic. Particularly as the latest resurgence of the virus threatens to undo the State's

progress over the past few months (as it has already done elsewhere around the world), courts have

recognized the State's overriding interest in public health and the flexibility accorded to it by

Jacobson. See, e.g., Agudath Israel of America et al v. Cuomo, No. 20-cv-4834 (E.D.N.Y.), Minute

Entry Oct. 9, 2020, ECF No. 19-1 (denying a temporary restraining order and preliminary

injunction against capacity limitations on synagogues in certain geographical areas imposed

through the State's "Cluster Action Initiative" for addressing localized clusters of COVID-19

---

[9] See New York, COVID Tracking Project, https://covidtracking.com/data/state/new-york#historical

cases), appeal pending, No. 20-3572 (2d Cir.); <u>Roman Catholic Diocese of Brooklyn, New York</u> <u>v. Cuomo</u>, No. 20 Civ. 4844, 2020 WL 6120167, at *1 (E.D.N.Y. Oct. 16, 2020) (same, as applied to Catholic churches); appeal pending, No. 20-3590 (2d Cir.).[10]

**B.     Equal Protection "Class of One" Analysis**

Even if <u>Jacobson</u>'s more deferential standard did not apply, Plaintiffs' claims fail under a standard equal protection analysis. To succeed on a "class of one" claim, Plaintiffs must demonstrate "the existence of persons in similar circumstances who received more favorable treatment than the plaintiff to provide an inference that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose – whether personal or otherwise – is all but certain." <u>Prestopnik v. Whelan</u>, 249 F. App'x 210, 212–13 (2d Cir. 2007) (internal quotations omitted). "A successful claim requires an extremely high degree of similarity between the plaintiff and her comparators." <u>Pappas v. Town</u> <u>of Enfield</u>, 602 F. App'x 35, 36 (2d Cir. 2015) (internal quotations omitted). To prevail on an equal protection class-of-one claim, a plaintiff must show that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. <u>Pappas</u>, 602 F. App'x at 36 (quoting <u>Vill. of Willowbrook v. Olech</u>, 528 U.S. 562, 564 (2000)). Plaintiffs must establish that "(i) no rational person could regard the circumstances of the plaintiff[s] to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the

---

[10] These cases have been consolidated for appeal to the Second Circuit. On November 9, 2020, the Second Circuit denied appellants' motions for injunctions pending appeal. <u>Agudath Israel of</u> <u>America et al v. Cuomo</u>, 2020 WL 6559473, at *1 (2d Cir. Nov. 9, 2020). On November 16, 2020, Plaintiffs filed an application for an injunction to the Supreme Court.

basis of a mistake." <u>Pappas</u>, 602 F. App'x at 36 (citing <u>Fortress Bible Church v. Feiner</u>, 694 F.3d 208, 222 (2d Cir. 2012)).

Plaintiffs in this matter fail to satisfy this test. First, they have failed to demonstrate the existence of any comparators with an "extremely high degree of similarity" to themselves. <u>Pappas</u>, 602 F. App'x at 36. Plaintiffs, in attempting to establish appropriate comparators, point to restaurants, catering halls, gyms, casinos, movie theaters, bowling alleys, television broadcasts, museums, and gyms, all of which are permitted to engage in some level of operation at the moment. (Pl. Memo. 2, 3, 6, 9, 12, 14.) But Plaintiffs do not, except in vague and conclusory terms, actually explain why they have a "high degree of similarity" to any of these businesses. And, in fact, theaters (small or not) differ from each of these types of businesses in highly relevant ways. Blog Decl. ¶¶ 109-142. Theaters inherently operate in a manner that poses an elevated risk of causing a "superspreader" event – all patrons enter and exit at once, queue to enter the venue, remain seated in one spot for long periods of time, and potentially congregate after the show. Blog Decl. ¶ 86. The activity of the performers on stage – singing, yelling, loudly speaking, and otherwise projecting their voices – maximizes the amount of aerosols produced, a circumstance that has itself been shown to increase the risk of spreading the virus. Blog Decl. ¶¶ 14, 23, 96, 103, 104, Exs. G, H, J, K.[11] Each of the supposed comparators that Plaintiffs point to do not share some or all of these qualities, and as such may properly be considered lower-risk activities than that of Plaintiffs. Blog Decl. ¶¶ 109-142. The closest that Plaintiffs comes to identifying a relevant comparator may

---

[11] <u>See also</u> New York Times, <u>'Godspell' in 2020: Masks, Partitions and a Contactless Crucifixion</u> (August 5, 2020), https://www.nytimes.com/2020/08/05/theater/godspell-berkshires-coronavirus.html (explaining the "dizzying array of prophylactic measures for both workers and audience members" needed by a Massachusetts theater needed to make even an *outdoor* production less risky); New York Times, <u>When Will It Be Safe to Sing Together Again?</u> (June 9, 2020), https://www.nytimes.com/2020/06/09/arts/music/choirs-singing-coronavirus-safe.html (explaining the potential of particles and aerosols from singing to spread COVID-19)

be in pointing to movie theaters, but by not featuring crew members and actors on stage directing aerosols at each other and the audience, even these venues are lower-risk than Plaintiffs' live performance venues. Blog Decl. ¶¶ 138-142. In any event, movie theaters in New York City are, like Plaintiffs (all of whom are located in Manhattan[12]), not yet allowed to operate.[13] Plaintiffs specifically do *not* claim as comparators other theaters, because, of course, all theaters (regardless of size) are being treated the same as Plaintiffs. Plaintiffs have thus failed to satisfy the first step of the "class of one" analysis – they have not identified any "highly similar" comparators who are being treated differently. The two most similar comparators – movie theaters located within New York City, and larger performance venues – are being treated identically.

But even if Plaintiffs *had* identified highly similar comparators that are being treated differently, all that is required for the government to justify a difference in treatment between highly similar comparators is a rational basis, <u>Pappas</u>, 602 F. App'x at 36, such that there is no inference that the plaintiff was "intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose – whether personal or otherwise – is all but certain." <u>Prestopnik</u>, 249 F. App'x at 212–13. Plaintiffs have not suggested – let alone established a likelihood of success – that the Governor has, for some unknown reason, decided to intentionally target "small theaters," much less these *specific* seven establishments, for worse treatment than their comparators. Nor would any such claim – that the Governor is intentionally trying to harm these venues – be remotely plausible. Plaintiffs therefore cannot establish the other requirement of a "class of one" claim – that they were treated differently from

---

[12] Compl. (ECF No. 1) ¶¶ 14-21.

[13] https://www.governor.ny.gov/news/governor-cuomo-announces-most-movie-theaters-outside-new-york-city-can-reopen-october-23 (permitting movie theaters outside of New York City to operate at 25% capacity, but directing that theaters within New York City remain closed)

highly similar comparators without a rational basis, in a manner suggesting that they were intentionally singled out for such treatment. Moreover, while one Plaintiff, the Clementine Company, declares that it has put into place what it believes to be adequate safety protocols as evidence that there is no rational basis for the difference in treatment between themselves and their supposed comparators (Declaration of Catherine Russell, ECF No. 9-3), the remaining six Plaintiffs have not made any such assurances (despite Plaintiffs' motion arguing that "*Plaintiffs* have installed" air scrubbers, filters, plexiglass barriers, etc. (Pl. Memo at 14 (emphasis added))).

Plaintiffs do not come close to satisfying either element of the "class of one" Equal Protection inquiry.  As such, they have not established a "clear or substantial" likelihood of success on the merits of their claim for the purposes of their motion for a preliminary injunction.

## II.     THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST STRONGLY FAVOR DEFENDANTS

The balance of the equities and the consideration of the public interest decidedly weigh in favor of denying Plaintiffs' request for a preliminary injunction. "As the Supreme Court reaffirmed in Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7 (2008), a plaintiff seeking a preliminary injunction must demonstrate not only that they have some likelihood of success on the merits and will suffer irreparable harm absent an injunction, but also that the 'balance of the equities tips in [their] favor and an injunction is in the public interest.'" Otoe-Missouria Tribe v. New York State Dep't of Fin. Svcs., 769 F.3d 105, 112 n.4. (2d Cir. 2014). "These factors merge when the Government is the opposing party." Make the Rd. New York v. Cuccinelli, 419 F. Supp. 3d 647, 665 (S.D.N.Y. 2019) (citing Nken v. Holder, 556 U.S. 418, 435 (2009)). "In assessing these factors, the court must 'balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief,' as well as 'the public consequences in employing the extraordinary remedy of injunction." Make the Road, 419 F. Supp.

3d at 665.

In making a determination as to the equities, a court may only issue an injunction if the balance of hardships tips in the plaintiff's favor. Salinger v. Colting, 607 F.3d 68, 80 (2d Cir. 2010) (citing Winter, 555 U.S. at 20 and eBay, Inc. v. MercExchange, 547 U.S. 388, 391 (2006)). Further, the court must ensure that the "public interest would not be disserved" by the issuance of a preliminary injunction. Salinger, 607 F.3d at 80 (citing eBay, 547 U.S. at 391). In exercising their discretion as to whether to enter an injunction, courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." New York State Rifle & Pistol Ass'n v. City of N.Y., 86 F. Supp. 3d 249, 258 (S.D.N.Y. 2015), aff'd sub nom. New York State Rifle & Pistol Ass'n, Inc. v. City of N.Y., 883 F.3d 45 (2d Cir. 2018) (quoting Weinberger v. Romero–Barcelo, 456 U.S. 305, 312 (1982)). This consideration includes the government's interest in public health. Million Youth March, Inc. v. Safir, 155 F.3d 124, 125–26 (2d Cir. 1998) (modifying injunction because District Court failed to consider government's interest in, *inter alia*, public health against First Amendment rights).

Here, prohibiting Plaintiffs from resuming operations at this time undoubtedly presents a hardship, but in light of the public health interests at stake, this private interest is decisively outweighed by the consideration of the public interest. As counseled by Jacobson, this Court should not override the judgment of the elected leadership of the State of New York in determining that the operation of performance venues in the midst of the COVID-19 pandemic presents a serious threat to public health, and that the public consequences of their operation would outweigh the benefits to Plaintiffs. See, e.g., Murray v. Cuomo, 460 F. Supp. 3d 430, 446 (S.D.N.Y. 2020) ("Controlling the spread of the disease in order to contain the pandemic, minimize deaths, allocate scarce hospital resources, and prevent a larger public health catastrophe (with its attendant other

15

negative impacts on society) is a powerful compelling government interest."). Evidence from other states across the country has clearly shown that reopening certain businesses, permitting mingling and crowd-generating activities too soon, and/or failing to take a slow, measured approach to the reopening process, has caused infection and recurrence rates to skyrocket.[14] As explained supra, the State is currently at a highly critical moment that will determine the future course of the pandemic. Now, at the precipice of a resurgence of this deadly scourge, is not the time for the Court to set aside the determinations of the State's elected leadership and public health experts. Permitting new potential superspreader events, when the State is on the verge of having to tighten existing restrictions to reduce contagion and save lives, would decidedly not be in the public interest.

## III.   PLAINTIFFS HAVE NOT SHOWN IRREPARABLE HARM

To satisfy the irreparable harm requirement, "the movant must demonstrate an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." Rodriguez v. DeBuono, 175 F.3d 227, 234 (2d Cir.1999) (quoting Shapiro v. Cadman Towers, Inc., 51 F.3d 328, 332 (2d Cir.1995)). Plaintiffs have failed to meet this

---

[14] See, e.g., NY Times, 100,000 cases in a single day push the U.S. into new terrain (November 5, 2020), https://www.nytimes.com/2020/11/04/world/100000-cases-in-a-single-day-push-the-us-into-new-terrain.html; NY Times, France and Germany enact sweeping restrictions to curb rises in cases and hospitalizations (Oct. 29, 2020), https://www.nytimes.com/live/2020/10/28/world/covid-19-coronavirus-updates/france-and-germany-enact-sweeping-restrictions-to-curb-rises-in-cases-and-hospitalizations (noting that European countries have reinstituted restrictions on bars and restaurants to address rising COVID-19 cases); ABC News, States that reopened too quickly amid coronavirus are facing a problem: Getting the genie back in the bottle (July 12, 2020), https://abcnews.go.com/Health/states-reopened-quickly-amid-coronavirus-facing-problemgenie/story?id=71648499; USA Today, At least 22 states pause reopening or take new steps to limit the spread of COVID-19 (June 30, 2020), https://www.usatoday.com/story/news/nation/2020/06/30/covid-cases-states-pausing-reopeningplans-list/3284513001/

threshold burden.

Plaintiffs' claimed harm caused by the temporary closure of their venues amounts to no more than financial harm. See Borey v. National Union Fire Ins. Co. of Pittsburgh, Pennsylvania, 934 F.2d 30, 34 (2d Cir. 1991) ("Monetary loss alone will generally not amount to irreparable harm. A monetary loss will not suffice unless the movant provides evidence of damage that cannot be rectified by financial compensation."); see also Luke's Catering Serv., LLC, 2020 WL 5425008, at *13 ("[W]hile the economic impact of the 50-person limitation undoubtedly hits hard, the Executive Orders are temporary; Plaintiffs are permitted to continue business operations within the confines of the Executive Orders; and no documentary evidence has been submitted to support Plaintiff's claims of near insolvency."). Moreover, Plaintiffs have not come forward with any specific evidence of the nature or extent of their claimed economic harm. On the other hand, the State suffers irreparable harm any time that it is enjoined from enforcing its policies. Maryland v. King, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers). In the present case, such harm is manifest because the directive Plaintiffs seek to challenge is intended to prevent a resurgence of COVID-19. If Plaintiffs were permitted to reopen before the State's public health officials determine that it is safe to do so, the danger to New Yorkers of becoming infected would increase and could result in death – an irreparable harm that could *not* be remedied by monetary relief.

## **CONCLUSION**

For the reasons set forth above, it is respectfully requested that the Court deny Plaintiffs' motion for a preliminary injunction and grant such other and further relief as is just and proper.

Dated: New York, New York
       November 20, 2020

> LETITIA JAMES
> Attorney General
> State of New York
> *Attorney for the State Defendants*

By: /s/ Matthew L. Conrad
> MATTHEW L. CONRAD
> Assistant Attorney General
> 28 Liberty Street
> New York, NY 10005
> Tel: (212) 416-8610
> Matthew.Conrad@ag.ny.gov