UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

─────────────────────────────────────────────

**THE CLEMENTINE COMPANY LLC.** d/b/a **THE THEATER
CENTER, PLAYERS THEATER MANAGEMENT CORP.** d/b/a
**THE PLAYERS THEATER, WEST END ARTISTS COMPANY**
d/b/a **THE ACTORS TEMPLE, SOHO PLAYHOUSE INC.** d/b/a
**SOHO PLAYHOUSE, THE GENE FRANKEL THEATRE LLC.,
TRIAD PROSCENIUM PARTNERS INC.** d/b/a **THE TRIAD,
CARAL LTD.** d/b/a **BROADWAY COMEDY CLUB,** and
**DO YOU LIKE COMEDY LLC.** d/b/a **NEW YORK
COMEDY CLUB,**

|  |  |
|---|---|
| Plaintiffs, | **MEMORANDUM OF LAW IN REPLY** |
| Against | Civil Action No.:  1:20-CV-08899 |

**ANDREW M. CUOMO**, in his Official
Capacity as Governor of the State of New York,
**ATTORNEY GENERAL OF THE STATE OF NEW YORK**,
**BILL de BLASIO**, in his Official Capacity as Mayor of the
City of New York and **THE STATE OF NEW YORK,**

Defendants.

─────────────────────────────────────────────

**THE MERMIGIS LAW GROUP, P.C.**
James G. Mermigis, Esq.
85 Cold Spring Road, Suite 200
Syosset, New York  11791
516-353-0075
James@MermigisLaw.com

*Attorneys for Plaintiffs*

1

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ……………………………………..…2

1. Roman Catholic Diocese v. Cuomo…………………………………..…4

2. Restaurants and Bars can have Live music in NYC…………………………6

3. Saturday Night Live is Hosting……………………………………………7

4.  Dr. Blog's Affidavit………………………………………………………7

5. Plaintiff's seeking equal treatment…………………………………………..13

Point 1- Plaintiff's entitled to a Preliminary Injunction…………………………..15

A.      Plaintiffs are Suffering Irreparable Harm………………………………16

B.      Plaintiff are likely to Prevail on Merits…………………………………18

C.      Balance of the Equities ……………………………………………23

D.      Public Interest……………………………………………………..24

Point 2. Jacobson has been Limited………………………………………25

Conclusion…………………………………………………………..26

## PRELIMINARY STATEMENT

The Plaintiffs in this lawsuit are a total of eight theaters who have moved "heaven and earth" to prepare their small venue theaters for an opening that will be safe for their employees and their customers during covid. The Plaintiffs are only seeking to open at 25% capacity or a 50 person maximum to enable ample space for social distancing concerns. Defendants' opposition wrongfully presumes that the Plaintiffs are seeking to open at full capacity. All theaters are located in Manhattan which has one of the lowest infection rates in the state at 1.9% over a fourteen day period.[1]

These eight theaters remain closed while other places of public assembly including Jazz dinner theaters, bars with live music, catering halls, restaurants, casinos, shopping malls, churches, bowling alleys, gyms have been allowed to reopen to the public. The theaters have a median capacity of *only 144 seats*, which is a lesser capacity than most restaurants, catering halls, gyms, casinos, shopping malls and bowling alleys. The median capacity of 144 seats also distinguishes these theaters from Broadway Theaters which range in capacity between 539 to 1933 seats. This *important* distinction makes these *theaters* eminently more capable of conforming to CDC health and safety guidelines. Defendants have failed to provide a legally satisfactory reason for this discriminatory treatment. Defendants can not base this discriminatory treatment on any identifiable differences in public health risks, nor can they claim that these

---

[1] forward.ny.gov

*small theater*s pose a greater health risk than these other venues, some of which present far more difficult challenges to practices such as social distancing.

The Defendants' initial Executive Orders were premised on the perceived need to "flatten the curve" so as to avoid overwhelming the State's hospitals and healthcare centers, not to eradicate the virus. Although the curve has been flattened for more than five months now, the Governor has nonetheless issued stricter and confusing executive orders that unreasonably and unnecessarily interfere with Plaintiffs' constitutional rights.

The shutdowns were billed as temporary measures necessary to "flatten the curve" and protect hospital capacity have become open-ended and ongoing restrictions aimed at a very different end- stopping the spread of an infectious disease and preventing new cases from arising-which requires ongoing and open-ended efforts.

On November 30, 2020, Governor Cuomo announced that 65% of the covid spread now comes from family gatherings and smaller social gatherings in homes where people do not wear masks. The small gathering spread is now the number one spreader. (Governor Cuomo Transcript attached as Exhibit A).

On November 25, 2020, the United States Supreme Court in *Roman Catholic Diocese of Brooklyn, New York v. Andrew M. Cuomo, Governor of New York*, 592 U.S. ___ (2020) reversed its decision in *South Bay United Pentecostal Church v. Newsom*, 140 Sup. Ct. 1613 (2020), by striking down Governor Cuomo's Executive Orders. It also limited its decision in *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905). Defendants' opposition relies heavily on *South Bay* and *Jacobson*.

3

**1.      Roman Catholic Diocese v.  Andrew M. Cuomo**

592 U.S._____ (2020)

Justice Gorsuch opined that, *"People may gather inside for extended periods in bus stations and airports, in laundromats and banks, in hardware stores and liquor shops. No apparent reason exists why people may not gather, subject to identical restrictions, in churches or synagogues, especially when religious institutions have made plain that they stand ready, able and willing to follow all the safety precautions required of "essential" businesses."*

The eight small venue theaters have been shutdown since March and have moved heaven and earth to be ready, able and willing to comply with all the safety precautions required of jazz dinner theaters, restaurants and bars with live music, Saturday night live, casinos, and catering halls.

In reversing *South Bay United Pentecostal Church v. Newsom*, 140 Sup. Ct. 1613 (2020), the Court opined that, *"At that time, Covid had been with us, in earnest for just three months. Now, as we round out 2020 and face the prospect of entering a second calendar year living in the pandemic's shadow, that rationale has expired according to its own terms. Even if the Constitution has taken a holiday during this pandemic, it cannot become a sabbatical."* Despite rounding out 2020, Governor Cuomo continues to enforce strict lockdowns on Plaintiffs with no end or guidance in sight. The Plaintiffs are individually owned companies and have been shutdown since March. They are on the brink of extinction.

Defendants rely also on *Jacobson,* which the Court in *Roman Catholic Diocese v. Cuomo* opines that, "the *Jacobson* decision involved an entirely different mode of analysis, an entirely different right, and an entirely different type of a restriction. In *Jacobson*, individuals can take

the vaccine, pay the fine or identify a basis for exemption." Here, by contrast, Governor Cuomo has effectively sought to ban small venue theaters since March and for as long as Governor Cuomo chooses.

The *Roman Catholic Diocese* case further limits Jacobson opining that, "Nothing in *Jacobson* purported to address, let alone approve, such serious and long lasting intrusions into settled constitutional rights. In fact, *Jacobson* explained that the challenged law survived only because it did not "contravene the Constitution of the United States" or "infringe any right granted or secured by that instrument." The Court further questioned why the modest *Jacobson* decision has given towering authority to overshadow the Constitution during a pandemic. The Roman Catholic Diocese decision concluded that "*we must not shelter in place when the Constitution is under attack. Things never go well when we do.*" The Court concluded that, "*It is time-past time-to make plain that, while the pandemic poses many grave challenges, there is no world in which the Constitution tolerates color-coded executive edicts that reopen liquor stores and bike shops but shutter churches, synagogues and mosques.*"

Defendants heavily rely on *South Bay* which was overturned by *Roman Catholic Diocese*. Defendants' brief cites South Bay when stating that, "Public Officials responding to a health crisis must be afforded especially broad latitude, such that they should not be open to 'second guessing' by an unelected judiciary which lacks the background, competence and expertise to assess public health and is not accountable to the people." (Defendants' Opposition Brief, Pg. 9).

Defendants assertions that "the State must have the flexibility to take steps to prevent a return to the peak of a pandemic, particularly as the latest resurgence of the virus threatens to

undo the State's progress over the past few months,"  were overturned by the Supreme Court in *Roman Catholic Diocese.*

In essence, since the Defendants are relying on case law that has been overturned by the Supreme Court, this Court should grant an Order preliminarily and permanently enjoining and prohibiting Defendants from enforcing the executive orders to the extent that they prohibit these eight small venue theaters from opening simultaneously with other entities comparable to these small venue theaters.

## 2. Restaurants and Bars can have Live Music Performances in New York City

Restaurants and Bars can have indoor musical performances with a live audience in New York City. The only requirement is that performers must remain at least 12 feet from the patrons. Patrons must also be seated at least 12 feet from performers. (See Frequently Asked Questions for Covid-19 Reopening in NYC as Exhibit B.)

The Birdland Jazz Club and Theater at 315 West 44th Street in Manhattan is set to open on Wednesday, December 2 at 7pm. (See Birdland Theater reopening announcement as Exhibit C.) The Jazz Theater is opening up at 25% capacity, which is the same capacity that Plaintiffs are seeking from the Defendants.

If these restaurants, bars and jazz theaters are allowed to open with live performances and the only requirement is that the performers are 12 feet away from the patrons, Plaintiffs' theaters should also be allowed to open with all the precautions that Plaintiffs have put in place.

### 3.      Saturday Night Live is Hosting a Live Studio Audience for its Show

The New York Times reported that Saturday Night Live paid audience members to adhere to covid guidelines noting that shows "must prohibit live audiences unless they consist only of paid employees, cast and crew." SNL found a loophole in the executive orders by cutting audience members a check and essentially treating them as extras for their weekly sketch show. (See Saturday Night Live Deadline Article as Exhibit D.)

New York State also established that television shows that decide to make an audience out of its employees, can only limit the viewing capacity to 25% of its typical group and no more than 100 people.

Plaintiffs are looking to open their theaters at 25% capacity or 50 people which is less than the Saturday Night Live Studio. If Saturday Night Live can safely have a live audience of 100 people, Plaintiffs' theaters can certainly have a live audience of 50 people.

### 4.   Dr. Blog's Affidavit

Dr. Blog based her affidavit on Plaintiffs seeking 100% occupancy and actors not wearing mask. Dr. Blog did not read the PI motion because Plaintiffs are clear that they are seeking only 25% capacity which will allow for ample space for social distancing.

The actors will also be required to wear clear masks.

The directors of the theaters have developed extensive and detailed safety plans which include staggering of arrival and departure times. (Russell Declaration ¶ 13.) The theaters will provide multiple entrances and exits, with clearly marked and supervised uni-directional foot traffic patterns with the spaces. (See Russell Declaration ¶ 13.)

In addition, Ticketmaster and other ticketing organizations have developed tools to assist in safe theatergoing with social distancing tools including timed-entry tools, entry-rate monitoring tools, contactless box office procedures and payments, mobile ordering, secure ticket transferring and – extremely important – contact-tracing support. (See Russell Declaration ¶ 14.)

The small size of a venue is no impediment to, but rather an enhancement of the ability of house management to facilitate the social distancing of a 25% capacity audience.  Public Assembly permits, Certificates of Occupancy and the Life Safety Code mandate sufficient egress and space for a 100% occupancy of each small venue, leaving 75% of statutorily mandated space available for social distancing and the fulfillment of CDC requirements when only 25% of the venue's capacity is admitted.  Indeed, a smaller group of patrons (i.e., a maximum of <50 in a 199-seat theater) can far more easily be controlled and managed, per CDC guidelines than patrons in a larger Broadway theater at 25% (450 people in a 1,800-seat theater). (See. Russell Declaration ¶ 16.)

But Dr. Blog's assertion about small venue shows' average running times is inaccurate; perhaps she is not a frequently theatergoer.  By far the majority of Off-Broadway performances have for years clocked in at well under two hours.  In fact, the typical pre-pandemic median was closer to 90 minutes. (See Russell ¶ 22.)  By contrast, as documented recently in *The Wall Street Journal* (see "Enjoy Your Meal – Quickly. Restaurants Introduce Time Limits," by Alina Dizik *WSJ*, October 5, 2020), the new intra-pandemic practice of many restaurants in limiting diners' time at table to anywhere from 90 minutes to two hours is viewed as an extraordinary departure from pre-pandemic

practices.  The comparison is all the more striking when, again, it is recalled that, as distinct from restaurant patrons, small venue audience members are not removing masks, eating or talking to each other at will throughout the duration of their time in attendance; nor are they physically exerting themselves, sweating and breathing heavily, as in a gym.

All the Plaintiff small venues in this suit have installed ventilation enhancements, including bi-polar ionization air scrubbers, portable air decontamination devices, electrostatic sprayers and/or MERV 13 filters. (See Russell Declaration ¶ 23.)

Each of the Plaintiff small venues has provided a declaration outlining the ventilation enhancements it has installed to comply with the basic safety protocols as laid out in the New York State Department of Health Interim Guidance for Low-Risk Indoor Arts and Entertainment During the COVID 19 Public Health Emergency.  These Declarations also avow all of the Plaintiffs' willingness to comply with any additional practicable guidelines advanced by the State.

In Paragraph 106, Dr. Blog is also concerned with musicians playing wind instruments.  None of the venues in this suit present shows with full orchestras or bands – there is no room for any more than two or three musicians.  Each venue has agreed to ban all wind instruments from their venues until specifically allowed by the CDC and New York State.

Dr. Blog is also concerned about actors exercising social distancing onstage.  As noted earlier, most of the venues will already have to comply with the safety practices

mandated by Actors' Equity Association which addresses actors' movements onstage as well as a host of other safety issues (see, again, "**Exhibit E**," "Actors' Equity Safety Guidelines").  In addition, please note "**Exhibit K**," of Russell Declaration which is a press photo of a *Saturday Night Live* television performance on Saturday, September 24, 2020 that shows that while all the performers on the stage are masked they are clearly not all six feet from each other.  It is unclear that there should be more heightened concern about safe distances between a discrete number of masked actors in a small venue than among a mass of performers on a TV sound stage.

In Paragraph 120, Dr. Blog writes, "During a large social gathering, whether it be a wedding, bar mitzvah or baptism, individuals must wear face coverings when they are in public and are: six feet within distance from other individuals."  She continues, "It is questionable whether small theaters can implement the same sort of social distancing measures and mask requirements effectively."  But, to the contrary – much as house managers have for decades successfully monitored and enforced proscriptions on cell phone use during performances – it will be far easier for a COVID-trained staff member to mandate mask wearing in a theater than for catering staff or conscientious guests to enforce it at large family or social gatherings.  Hundreds of photos and social media posts have documented the lack of social distancing and mask wearing at many such events which have been identified as "super-spreaders." (See Russell Declaration ¶ 34.)

In Paragraphs 132-136, Dr. Dr. Blog maintains that churches are safer than theaters.  We maintain the opposite  Indeed, in light of the recent United States Supreme

Court *per curiam* decision granting injunctive relief in *Roman Catholic Diocese of Brooklyn, New York v. Andrew M. Cuomo, Governor of New York* (593 U.S. ____ (2020)), the Plaintiffs wish to note the striking logistical and operational similarities between theaters and houses of worship (the latter of which, even in the absence of the *Diocese of Brooklyn* opinion, are currently allowed to operate under New York State regulations at 25% capacity or with a maximum occupancy of 50 people). (See Russell Declaration ¶ 39.)

Further, one of the Plaintiff parties in this suit, the Actors Temple, is in fact a synagogue; and Plaintiff The Theater Center has been a long-term home to several religious groups, one of which currently holds services here on Sunday mornings in compliance with said New York State regulations.  The general similarity of praxis between theaters and places of worship weighs in our favor, all the more so in that any singing, declamation, or performative acts occur only onstage in a theater, as opposed to among congregants in a place of worship.  We also note in passing that a theater employee can be expected to enforce mask wearing and social distancing more effectively than might a congregant or even a church usher who is not so unambiguously empowered to act as an enforcer. (See Russell Declaration ¶ 40.)

The Plaintiffs maintain, however, that the operation of small theater venues is actually safer than that of both movie theaters and restaurants.  For instance, the long-inured cinema ritual of eating popcorn, candy and hot dogs (not to mention, increasingly, even more elaborate edibles) necessitates the removal of masks during a film's running

time, while there is no directly parallel tradition in most small theater venues. Even in those venues where food is available, we contend, here as elsewhere, that any theoretical risk involved is less than that in currently operating restaurants, where patrons talk more freely and generally face each other rather than in a uniform forward direction. Moreover, proper audience comportment (such as mask wearing, avoidance of random movement throughout the premises or among others before, during and after a show, etc.), is, as noted several times herein, far more effectively enforced by a vigilant and professionalized theater house management staff than by any typical cadre of cinema ushers or restaurant wait staff personnel. (Russell Declaration ¶ 44.)

Finally, Dr. Blog claims (Paragraph 142) that small venue theaters cannot rely on any similarity between their operations and that of movie theaters because, being located in Manhattan, small venues are *de facto* constrained by the continued closure of movie theaters within New York County. We note, however, that while movie theaters may be classified as "non-essential," (due in large part to their central *raison d'être* – the purveyance of films – being otherwise generally satisfied via electronic streaming platforms), there is, as any theatergoer will attest, no substitute for the experience of live performance. The "essentiality" of what Plaintiff small venues provide is not replaceable. (Russell Declaration ¶ 45.)

Plaintiffs, through their Declarations and plans have satisfied very safety concern that Dr. Blog addressed in her Declaration.

## **5.  Plaintiffs seeking similar treatment as others businesses allowed to open**

The State continues to govern impartially and arbitrarily by allowing Jazz Dinner Theaters, Churches, Bars with Live Music, Malls, Casinos,  Movie Theaters, Restaurants, Gyms, Catering Halls for weddings, christenings and bar mitzvahs, Bowling Alleys, "Saturday Night Live", schools and colleges in the state to open, yet Plaintiffs' *theaters* in Manhattan continue to be shut down even though Manhattan has met and exceeded the re-opening metrics put in place by Governor Cuomo since June 13, 2020.

These statistics show that the curve flattened a long time ago and there is no longer a state of emergency in the borough of Manhattan.

Nine months into the state's experiment with executive order shut downs, the constitutional landscape has changed. Whatever latitude for constitutionally questionable orders may have existed when the pandemic was new, there is no longer legal justification for prohibiting people from earning a living if they work in or own what a governor deems a "non-essential" business. For one thing, the underlying facts have changed markedly. New York has reopened businesses over the summer while keeping the virus at bay. The use of masks and social distancing is universal, supplemented by temperature checks on the part of some businesses.

Multiple studies now suggest the lockdowns were not effective,[2] and medical and public health professionals have raised concerns about their "devastating effects on short and long term public health."[3]

The Courts may provide state and local officials greater deference when making time-sensitive decisions in the midst of an emergency but the deference cannot go on forever. It is no longer March, April or May. It is now early December and Defendants have no anticipated end-date to their emergency interventions.

Absent a robust system of checks and balances, the guarantees of liberty set forth in the Constitution are just ink on parchment. There is no question that a global pandemic poses serious challenges for governments. But the response to this pandemic or any emergency for that matter cannot be permitted to undermine our system of constitutional liberties or the system of checks and balances protecting those liberties. Defendants are permitted to act with no input from the legislature. The judiciary remains the ONLY check on the exercise of defendants' power.

Plaintiffs are individually owned *small venue theaters* with a median of 144 seats. If not allowed to open this fall, Plaintiffs may be forced to permanently shut their doors. Plaintiffs have all conformed their *small venue theaters* to exceed CDC safety protocols for covid-19.

Plaintiffs have been affected terribly by the Governor's executive orders. Under threat of criminal penalties, Plaintiffs have been forced to close their "*small venue theaters,*" depriving the Plaintiffs of their liberty and property interests without due process. At the same time, without offering any justification, the Governor has allowed, and is still allowing, Malls,

---

[2] www.wsj.com/articles/the-failed-experiment-of-covid-lockdowns

[3] https://gbdeclaration.org

14

Casinos, Restaurants, Gyms, Catering Halls, Bowling Alleys, Schools and Colleges to open even though: (a) those businesses must also adhere to guidance from the U.S. Centers for Disease Control and Prevention ("CDC") on "social distancing"; and (b) Plaintiffs are fully capable of adhering to those same guide-lines if allowed to open their *small venue theaters*.

At the present time, Plaintiffs have lost millions of dollars in revenue and have had to lay off at least 8,000 employees throughout New York City.

A public health emergency does not give Defendants *carte blanche* to disregard the Constitution for as long as the medical problem persists.

Simply, the crux of this case is that there is no basis for imposing a shut down of *small venue theaters*, while otherwise permitting restaurants, catering halls, shopping malls, gyms, casinos and bowling alleys to operate.

## POINT I

### PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION

To obtain a preliminary injunction, plaintiffs must demonstrate: (1) irreparable injury; (2) a likelihood of success on the merits; (3) a balance of equities tipping in the moving party's favor; and (4) that the public interest would not be disserved by injunctive relief. See *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Glossip v. Gross,* 576 U.S. 863, 876 (2015); *Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 n.4 (2d Cir. 2010). For the reasons explained below, the plaintiffs satisfy each of these four elements required to issue a preliminary injunction. Therefore, this Court should issue an order enjoining enforcement of the shut down of *small venue theaters.*

### A.    Plaintiffs are Suffering Irreparable Harm.

The Second Circuit has repeatedly found that the showing of irreparable harm "is the single most important prerequisite for the issuance of a preliminary injunction." *Rodriguez ex rel. Rodriguez v. DeBuono,* 175 F.3d 227, 233-34 (2d Cir. 1999); *accord Yang v. Kosinski*, 960 F.3d 119, 128 (2d Cir. 2020). The court can presume irreparable injury where it is alleged that a constitutional right has been violated. See, e.g., *Yang*, 960 F.3d at 128; *Beal v. Stern,* 184 F.3d 117, 123-24 (2d Cir. 1999) (presuming irreparable harm and proceeding directly to likelihood-of-success standard where constitutional right violations were alleged); *Jolly v. Coughlin,* 76 F.3d 468, 482 (2d Cir. 1996) ("it is the alleged violation of a constitutional right that triggers a finding of irreparable harm," as such "a harm that cannot be adequately compensated monetarily") (emphasis in original) (citations omitted).

As explained below, plaintiffs are able to show a likelihood of success on the merits for their equal protection claim, which merits a presumption of irreparable harm. Indeed, analogous to *Jolly,* it is proper for this Court to presume irreparable injury by the mere fact that the plaintiffs allege in their complaint a violation of their equal protection rights. As the Second Circuit held in *Jolly,* it is beyond question that the denial of plaintiffs' equal protection rights "is a harm that cannot be adequately compensated monetarily." Thus, by demonstrating below a likelihood of success regarding plaintiffs' equal protection claim, this Court may similarly find that plaintiffs have made a "strong" showing of irreparable harm. See *Yang,* 960 F.3d at 128.

In addition, Second Circuit courts have held that the "significant possibility" that plaintiffs may be driven out of business in the period before a trial can be held is sufficient to

find that the irreparable harm prong has been satisfied. *Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.,* 601 F.2d 48, 58 (2d Cir. 1979) ("[t]here can be no doubt that if the [applicant] had shown a significant possibility that it would be driven out of business in the period before a trial could be held, the *Hamilton-Benrus* test would have been amply passed"). Indeed, the Second Circuit has expanded the *Hamilton* test to include "major disruption of business" and a "threat to the continued existence of a business." *Nemer Jeep-Eagle, Inc. v. Jeep Eagle Sales Corp.*, 992 F.2d 430, 435-36 (2d Cir. 1993) (emphasis in original).

Beyond harm to constitutional rights, a "substantial loss of business and perhaps even bankruptcy" absent preliminary injunctive relief shows "irreparable injury." *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975). "Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm." *Celsis in Vitro, Inc. v. CellzDirect, Inc.,* 664 F.3d 922, 930 (Fed. Cir. 2012).

Defendants' orders requiring the entire *small venue theater industry* in New York to remain closed for nine months and with no end in sight is causing an existential crisis for the *small venue theater* industry in New York.

Here, the plaintiffs allege in their complaint that the shut down of their small theaters has resulted in devastating economic loss, and that each day the shut down is allowed to exist plaintiffs are at further risk of permanently shutting their doors. (Russell Decl. ¶ 2). Even if the plaintiffs were to win this case at trial, small venue theaters throughout New York State may not be able to return due to the significant financial harm caused by Defendants' shut down orders. Thus, the plaintiffs have made a strong showing of irreparable harm on this basis as well.

## B. Plaintiffs are Likely to Prevail on the Merits of Their Equal Protection Claim.

In reversing *South Bay United Pentecostal Church v. Newsom*, 140 Sup. Ct. 1613 (2020), the Court opined that, "*At that time, Covid had been with us, in earnest for just three months. Now, as we round out 2020 and face the prospect of entering a second calendar year living in the pandemic's shadow, that rationale has expired according to its own terms. Even if the Constitution has taken a holiday during this pandemic, it cannot become a sabbatical.*" Despite rounding out 2020, Governor Cuomo continues to enforce strict lockdowns on Plaintiffs with no end or guidance in sight. The Plaintiffs are individually owned companies and have been shutdown since March. They are on the brink of extinction.

Defendants rely also on *Jacobson,* which the Court in *Roman Catholic Diocese v. Cuomo* opines that, "the *Jacobson* decision involved an entirely different mode of analysis, an entirely different right, and an entirely different type of a restriction. In *Jacobson*, individuals can take the vaccine, pay the fine or identify a basis for exemption." Here, by contrast, Governor Cuomo has effectively sought to ban small venue theaters since March and for as long as Governor Cuomo chooses.

The *Roman Catholic Diocese* case further limits Jacobson opining that, "Nothing in *Jacobson* purported to address, let alone approve, such serious and long lasting intrusions into settled constitutional rights. In fact, *Jacobson* explained that the challenged law survived only because it did not "contravene the Constitution of the United States" or "infringe any right granted or secured by that instrument." The Court further questioned why the modest *Jacobson* decision has given towering authority to overshadow the Constitution during a pandemic. The

Roman Catholic Diocese decision concluded that "*we must not shelter in place when the Constitution is under attack. Things never go well when we do.*" The Court concluded that, "*It is time-past time-to make plain that, while the pandemic poses many grave challenges, there is no world in which the Constitution tolerates color-coded executive edicts that reopen liquor stores and bike shops but shutter churches, synagogues and mosques.*"

Defendants heavily rely on *South Bay* which was overturned by *Roman Catholic Diocese*. Defendants' brief cites South Bay when stating that, "Public Officials responding to a health crisis must be afforded especially broad latitude, such that they should not be open to 'second guessing' by an unelected judiciary which lacks the background, competence and expertise to assess public health and is not accountable to the people." (Defendants' Opposition Brief, Pg. 9).

Defendants assertions that "the State must have the flexibility to take steps to prevent a return to the peak of a pandemic, particularly as the latest resurgence of the virus threatens to undo the State's progress over the past few months," were overturned by the Supreme Court in *Roman Catholic Diocese.*

In essence, since the Defendants are relying on case law that has been overturned by the Supreme Court, this Court should grant an Order preliminarily and permanently enjoining and prohibiting Defendants from enforcing the executive orders to the extent that they prohibit these eight small venue theaters from opening simultaneously with other entities comparable to these small venue theaters.

The Constitution guarantees to all persons the "equal protection of the laws," and this right means that the government must treat similarly-situated individuals in the same manner. U.S. Const. Amend. XIV, § 1; *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985) ("[t]he Equal Protection Clause . . . is essentially a direction that all similarly situated persons should be treated alike"). The Supreme Court recognized in *Olech* that equal protection claims may be brought by a "class of one" "where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." See *Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *Analytical Diagnostic Labs, Inc. v. Kusel,* 626 F.3d 135, 140 (2d Cir. 2010). The class-of-one claim protects every person within the state's jurisdiction "against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Olech*, 528 U.S. at 564 (emphasis added) (citations omitted). To prove their equal protection claim under a class-of-one theory, the plaintiffs must show only a high degree of similarity between themselves and the persons with whom they compare themselves, and proof of the "defendant's subjective ill-will" is not required. *Hu v. City of New York,* 927 F.3d 81, 93 (2d Cir. 2019).

Here, the plaintiffs easily satisfy each of the necessary class-of-one elements. First, the plaintiffs are similarly-situated because there is no difference whether patrons sit in restaurant, catering hall, bowling alley, casino or a *small venue theater* with air filtration, ventilation  and purification standards in place. Second, the state's difference in treatment when the plaintiffs seek to open their small venue theaters under the same guidelines in place for restaurants, catering halls, gyms, casinos and shopping malls has no rational basis.

20

Jazz Theaters are allowed to have a live show. Saturday Night Live is allowed to have a live audience. Restaurants and bars around the city have indoor live music or bands. Whether its incidental or not, there are audiences in the city having dinner and listening to jazz or other live music. Plaintiffs theaters are similar to these venues. In fact, all of the Plaintiff small venues in this suit have installed ventilation enhancements, including bi-polar ionization air scrubbers, portable air decontamination devices, electrostatic sprayers and/or MERV 13 filters. Restaurants, bars and jazz theaters are not required to install these ventilation enhancements.

## I.  Plaintiffs Satisfy the Similarly-Situated Requirement.

Although *Olech* did not define "similarly situated," it is clear from other decisions from the Supreme Court and the Second Circuit that "similarly situated" means "similarly," rather than "identically." See, e.g., *Cleburne v. Cleburne Living Center*, 473 U.S. 432, 447-450 (1985) (holding that requiring special permit for group home for the intellectually disabled violated equal protection when a permit was "not require[d] . . . for apartment houses, multiple dwellings, boarding and lodging houses, fraternity or sorority houses, dormitories, apartment hotels, hospitals, sanitariums, nursing homes for convalescents or the aged"); *Third Church of Christ v. New York City,* 626 F.3d 667, 670 (2d Cir. 2010) (holding that hotels' catering was "similarly situated" to church's catering). Indeed, this principle was reaffirmed by the Second Circuit in a class-of-one analysis. See *Fortress Bible Church v. Feiner*, 694 F.3d 208, 221-224 (2d Cir. 2012). In that case, the court held: The Church's use of multiple comparators is unusual . . . We conclude, however, that the Church's evidence of several other projects treated differently

with regard to discrete issues is sufficient . . . to support a class-of-one claim . . . [T]he Church has presented overwhelming evidence that its application was singled out by the Town for disparate treatment. Though each of the comparator projects involved features unique to that proposal, the Town has not explained how those other features could have influenced discrete issues like the adequacy of parking, the safety of retaining walls, or increased traffic . . . [W]here, as here, a decision is based on several discrete concerns, and a claimant presents evidence that comparators were treated differently with regard to those specific concerns without any plausible explanation for the disparity such a claim can succeed . . . We affirm the district court's conclusion that the Church has adequately established a class-of-one Equal Protection claim . . ." *Fortress Bible Church*, 694 F.3d at 221-224 (emphasis added); see also *LaTrieste Restaurant & Cabaret v. Village of Port Chester,* 40 F.3d 587, 590 (2d Cir. 1994) (finding that comparator properties were similarly-situated — even though they had different zoning classifications and also were a different type of business — because those purported differences did not explain the government's differential treatment).

     Here, the similarly-situated requirement for the class-of-one category has easily been met. Jazz Dinner Theaters are operating at 25% capacity, Restaurants and bars in Manhattan are allowed to open at 25% with live music. Catering halls are allowed to host weddings, christenings and other events at a 50-person limit. Gyms are open at 33% capacity and bowling alleys are open at 50%. Casinos are also open since September 9, yet small venue theaters continue to be shut down. Such an arbitrary distinctions are a denial of equal protection of the laws in the most literal sense. The state cannot credibly argue that plaintiffs do not satisfy the similarly-situated requirement.

Further, the state's guidance that allows significantly riskier activities then sitting in small ventilated theater — including bowling alleys, museums, and gyms — all of which are permitted by the state to operate at capacities far greater than 50 people. These examples are certainly relevant under Second Circuit precedent for plaintiffs' equal protection claim. See *Fortress Bible Church*, 694 F.3d at 221-224.

## II. There is No Rational Basis for Treating the Plaintiffs Differently.

All of the Plaintiff small venues in this suit have installed ventilation enhancements, including bi-polar ionization air scrubbers, portable air decontamination devices, electrostatic sprayers and/or MERV 13 filters. There is no rational basis for Birdland Jazz Theater and Saturday Night Live to operate while excluding Plaintiffs small theaters. There is no rational basis for restaurants and bars to have live music, incidental or not, and Plaintiffs cannot operate their theaters.

Restaurants, Bars and catering halls are not required to install air scrubbers and Merv 13 filters, yet they are allowed to open. The state gives no plausible explanation why these businesses can be trusted to comply with all COVID-19 protocols, but the plaintiffs' small venue theaters cannot.

## C.       Balance of Equities Weighs in Favor of the Plaintiffs

"A balance of equities tipping in favor of the party requesting a preliminary injunction" means a balance of the hardships against the benefits. *Ligon v. City of New York*, 925 F. Supp. 2d

478, 539 (S.D.N.Y. 2013) (characterizing the balancing of "hardship imposed on one party" and "benefit to the other" as "balance[ing] [of] the equities"). With respect to balancing the hardships, economic or financial hardships have been sufficient to tip the scales in favor of granting a preliminary injunction. See, e.g., *Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.*, 601 F.2d 48, 58 (2d Cir. 1979); *Int'l Bus. Mach. v. Johnson*, 629 F. Supp. 2d 321, 333-34 (S.D.N.Y. 2009). Furthermore, when an injunction is sought to stay enforcement of a law that is purported to protect the public interest, the hardship to the non- movant government can be measured by the extent to which the law furthers such protection. See *Ass'n of Jewish Camp Operators v. Cuomo,* 1:20-CV-0687, 2020 WL 3766496, at *4 (N.D.N.Y. July 6, 2020)

Here, as explained above, absent a stay the plaintiffs' equal protection rights will be violated. Although the state will argue that the threat to public health outweighs the harm caused by its violation of plaintiffs' equal protection rights, such an argument ignores the fact that the opening of *small venue theaters* contemplated by the plaintiffs is less risky than the indoor dining, attending a wedding, going to a gym, bowling or sitting in a casino. In sum, because the plaintiffs have already established that they will be irreparably harmed absent a stay, the defendants cannot contest that the plaintiffs have demonstrated that the balance of equities tip in their favor.

**D. The Public Interest is Served by Issuing a Preliminary Injunction.**

The public interest is served by the protection of plaintiffs' constitutional rights. *Jolly v. Coughlin,* 907 F. Supp. 63, 65 (S.D.N.Y. 1995) ("defendants have failed to demonstrate that their epidemiological concerns outweigh the strong public interest in following the law, namely RFRA

and the Eighth Amendment to the Constitution"); *Roberts v. Neace,* 958 F.3d 409, 416 (6th Cir. 2020) ("treatment of similarly situated entities in comparable ways serves public health interest at the same time it preserves bedrock free-exercise guarantees"). A preliminary injunction is the best — and only — relief available to protect the plaintiffs' rights under the Fourteenth Amendment. Thus, granting the plaintiffs a preliminary injunction protects not just the plaintiffs, but also the public, from irreparable injury.

The Plaintiffs through their Declarations have addressed all of Dr. Blog's health concerns. Therefore, it is in the public interest for these small theaters to open.

## POINT II

## JACOBSON V. MASSACHUSETTS HAS BEEN LIMITED

Constitutional rights do not wholly evaporate in times of emergency. See *Jacobson v. Massachusetts,* 197 U.S. 11, 29; 25 S. Ct. 358; 49 L. Ed. 643 (1905). Indeed, the law has long been settled that all essential liberties remain protected at all times, even during the gravest of emergencies. *Bell v. Burson*, 402 U.S. 535, 542; 91 S. Ct. 1586; 29 L. Ed. 2d 90 (1971); *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 164-65; 83 S. Ct. 554; 9 L. Ed. 2d 644 (1963). While States may implicate police powers to take swift action necessary to protect public health and safety, those powers are not limitless, and are subject to judicial review. See *Jacobson,* 197 U.S. at 31, 38-39; *Robinson v. Attorney Gen.*, 957 F.3d 1171, 1179 (11th Cir. 2020) ('while constitutional rights have limits, so does a state's power to issue executive orders limiting such rights in times of emergency').

A public health crisis state of emergency does not entitle the Governor to cast away constitutional rights and protections full throttle with arbitrary and discriminatory Executive Orders. As outlined above, the Governor's issuance of such patently arbitrary orders under the contrived guise of "mitigating the spread of COVID-19, protecting the public health, and providing essential protections to vulnerable New Yorkers" is undoubtedly an improper constraint on Plaintiffs' protected Constitutional rights. (See *Meyer v. Nebraska*, 262 U.S. 390, 399-400; 43 S. Ct. 625; 67 L. Ed. 1042 (1923).

Here, the reasons why the state's refusal to grant plaintiffs the requested exemption to open *small venue theaters* does not have a rational basis as discussed above — namely, the state fails to plausibly explain why it treats the plaintiffs differently versus other similarly situated businesses or venues. For those reasons, the shut down of small venue theaters fails the limited Jacobson test.

## CONCLUSION

In summary, Plaintiffs are not seeking through this lawsuit any kind of special treatment. To the contrary, they are only seeking to be treated the same as other business venues that Defendants have already allowed to reopen.

For all the foregoing reasons, Plaintiffs respectfully ask the Court to issue a preliminary injunction against Defendants' orders to the extent they require small venue theaters to remain closed while Restaurants, Bars, Jazz Theaters, Churches, Catering Halls, Shopping Malls, Casinos, Bowling Alleys and Gyms are allowed to be open.

Dated: Syosset, New York
          December 1, 2020

                    Respectfully submitted,


                    **THE MERMIGIS LAW GROUP, P.C.**

                              /s/James Mermigis
                    By:_____
                    James G. Mermigis, Esq.
                    85 Cold Spring Road, Suite 200
                    Syosset, New York  11791
                    516-353-0075
                    James@MermigisLaw.com

                    *Attorneys for Plaintiffs*