## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE CLEMENTINE COMPANY, *et al.*,<br><br>       Plaintiffs,<br><br>v.<br><br>ANDREW M. CUOMO, as governor of the State of New York, *et al.*,<br>       Defendants. | No. 1:20-cv-08899-CM<br><br><br>**AMICUS BRIEF OF THE<br>LIBERTY JUSTICE CENTER** |

## INTRODUCTION

"The First Amendment is a kind of Equal Protection Clause for ideas." *Barr v. Am. Ass'n of Political Consultants*, 140 S. Ct. 2335, 2354 (2020) (quoting *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 470 (2015) (Scalia, J., dissenting)). Governor Cuomo is violating this fundamental guarantee of equal treatment for ideas, extending his favor to certain speakers and their speech-based assemblies while denying it to others, including the Plaintiffs.

In doing so, the Governor allows some speech-based assemblies protected by the First Amendment while barring other speech-based assemblies that enjoy the same constitutional standing. This content- or medium-based discrimination is subject to strict scrutiny. Assuming the government has a compelling interest in fighting the COVID-19 pandemic, its method of granting exemptions is not narrowly tailored because it treats speakers differently based solely on the content or medium of their speech, which finds no justification in science or law. For this reason, the ban on gatherings as applied to Plaintiffs must fail.

## ARGUMENT

### I.   Live theater performances are protected First Amendment expressive speech.

"[T]he person asserting a First Amendment claim often has been a theater owner . . ." who must come to court to protect "a free flow from creator to audience" and "free access of the public to the expression." *Young v. Am. Mini Theatres*, 427 U.S. 50, 77 (1976) (Powell, J., concurring). Courts have consistently held that artistic expression, such as the live theater and comedy performances sponsored by Plaintiffs, are protected by the First Amendment. *Schad v. Mount Ephraim*, 452 U.S. 61, 65 (1981) ("live entertainment, such as musical and dramatic works, fall within the First Amendment guarantee."); *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 557–58 (1975); *Rogers v. Grimaldi*, 875 F.2d 994, 997 (2d Cir. 1989) ("Movies, plays, books, and songs are all indisputably works of artistic expression and deserve protection."). *See, e.g., Collins v. Ainsworth,* 382 F.3d 529, 539 (5th Cir. 2004); *B. Cinevision Corp. v. City of Burbank*, 745 F.2d 560, 568–69 (9th Cir. 1984); *F. Manlove v. Unified Gov't of Athens-Clarke Cty.*, 680 S.E.2d 405, 407–08 (Ga. 2009).

Moreover, theatrical, artistic, and musical expression is protected by the First Amendment's speech for three interrelated but important reasons. First, theatrical and comedic speech about politics is speech about politics just as much as pundits' or politicians' speech about politics. "Our nation boasts a long history of protecting parody and satire. '[F]rom the early cartoon portraying George Washington as an ass down to the present day, . . . satirical cartoons have played a prominent role in public and political debate.' [*Hustler Magazine v. Falwell*, 485 U.S. 46, 54 (1988)]. And

parody, like all protected speech, need not be high-minded or respectful to find safe haven under the First Amendment." *Novak v. City of Parma*, 932 F.3d 421, 428 (6th Cir. 2019). Numerous plays and musicals, both popular and *avante garde*, contain extensive political commentary. *See, e.g.*, *Les Misérables, Evita, Hamilton*. And it's hardly the comedians' fault that many of their best laugh lines come at the expense of politicians. *See, e.g.*, Will Rogers ("I don't make jokes. I just watch the government and report the facts." "Alexander Hamilton started the U.S. Treasury with nothing, and that was the closest our country has ever been to being even."). When theaters and comedy clubs host these shows, they host core political speech, which is the very heart of the First Amendment. *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 790 (2011).

Second, theatrical and comedic performances are protected because "the line between the informing and the entertaining is too elusive" for a court to distinguish political and cultural commentary from entertainment. *Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386, 390 (4th Cir. 1993) (citing *Winters v. New York*, 333 U.S. 507, 510 (1948)). Whether a particular play is more inspirational than informative is not a line for judges to draw: "it is difficult to distinguish politics from entertainment, and dangerous to try." *Brown*, 564 U.S. at 790.

Third, artistic expression is also protected because the artistry is inherently expressive speech, and the First Amendment protects speech beyond just the strictly political. *Ward v. Rock Against Racism*, 491 U.S. 781, 790 (1989); *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 602–03 (1998) (Souter, J., dissenting). The First

Amendment applies whether to "the unquestionably shielded painting of Jackson Pollock, music of Arnold Schoenberg, or Jabberwocky verse of Lewis Carroll." *Hurley v. Irish–Am. Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 569 (1995).

Finally, artistic expression is protected whether it is produced by a for-profit or non-profit sponsor. *Time Inc. v. Hill,* 385 U.S. 374, 396–97 (1967) ("'That books, newspapers, and magazines are published and sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment.'") (quoting *Joseph Burstyn, Inc. v. Wilson,* 343 U.S. 495, 501–502 (1952)); *Smith v. California*, 361 U.S. 147, 150 (1959) ("It is of course no matter that the dissemination [of books] takes place under commercial auspices."); *Perry v. L.A. Police Dep't*, 121 F.3d 1365, 1368 (9th Cir. 1997) ("music [or] buttons . . . bearing political, religious, and ideological messages" are "expressive items . . . [that] . . . do not lose their constitutional protection simply because they are sold rather than given away"); *McClellan v. City of Alexandria*, 363 F. Supp. 3d 665, 675 (E.D. Va. 2019) (quoting *Davenport v. City of Alexandria*, 710 F.2d 148, 150 n.6 (4th Cir. 1983) (en banc): "'Live entertainment is protected speech' even if it 'generates a profit.'"). Thus, that the Plaintiffs may be for-profit theater companies is of no moment to the level of protection extended to their expression; the commercial nature does not transform their artistry into commercial speech entitled to lesser protection. *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 406 F. Supp. 3d 1258, 1290 (M.D. Ala. 2019). In sum, the Plaintiffs' expression is entitled to the protection of the First Amendment.

## II.     The Governor may not favor some gatherings protected by the First Amendment over other gatherings protected by the First Amendment.

"There are certain constitutional red lines that a State may not cross even in a crisis. Those red lines include racial discrimination, religious discrimination, and content-based suppression of speech." *Calvary Chapel Dayton Valley*, 140 S. Ct. at 2614-15 (Gorsuch, J., dissenting from denial of application). Unfortunately, the Governor has done just that, preferring some speakers based on the content of their speech while barring the speech of others.

The Governor has done this in several ways. First, his order prefers certain types of First Amendment assemblies over others. Under the Governor's orders, a college professor may exercise his right to speak and teach, a right protected by the First Amendment, *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957), with no explicit restriction on class size. *See Reopening New York—Higher Education Guidelines*.[1] Under the terms of the Governor's orders, even setting aside *Roman Catholic Diocese of Brooklyn,* a church or synagogue not in a colored 'zone' may hold an indoor service at 33 percent capacity. *See Reopening New York—Guidelines for Religious and Funeral Services*.[2]

---

[1] Available at
https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/Higher_Education_Summary_Guidelines.pdf.
[2] Available at
https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/ReligiousandFuneralServicesSummaryGuidance.pdf

Beyond the Governor's order itself, the Governor has also clearly communicated that mass gatherings to convey a particular political message in support of police reform and racial justice may occur without worrying about enforcement of the order. *Soos v. Cuomo,* No. 1:20-cv-651 (GLS/DJS), 2020 U.S. Dist. LEXIS 111808, at \*32 (N.D.N.Y. June 26, 2020) ("[B]y acting as they did [in their public statements praising and encouraging the Black Lives Matter protests even during the pandemic], Governor Cuomo and Mayor de Blasio sent a clear message that mass protests are deserving of preferential treatment.").

If 50 people can gather to hear a professor's lecture on politics or a priest's sermon on politics, but not a comedian's satire on politics, the different treatment depends on the nature of the content delivered at the event. Academic or religious content is preferred; artistic or comedic content is banned. This is not a neutral time, place, and manner restriction like a fire code or a conduct regulation that incidentally burdens speech. *See Barr* 140 S. Ct. at 2347 (plurality) (robocall ban is not simply an economic regulation). Because the difference in treatment is "based on the message the speaker conveys," it is content-based. *Id.* at 2346 (quoting *Reed,* 576 U.S. at 163). And content-based classifications, whether they favor or disfavor a particular category of speech, are subject to strict scrutiny. *Id.* at 2347 (quoting *Reed*, 576 U.S. at 170) ("Laws favoring some speakers over others demand strict scrutiny when they legislature's speaker preference reflects a content preference."); *id.* at 2346 ("Because the law favors speech made for collecting government debt over political and other speech,

the law is a content-based restriction on speech."). Such preferences are "presumptively unconstitutional." *Reed,* 576 U.S. at 163.

The Governor's *de jure* protection for academic and religious speech and his *ex cathedra* pronouncements protecting protest speech reflect content preferences that are presumptively unconstitutional and can only survive if they pass strictest scrutiny. This they cannot do.

They cannot survive strict scrutiny for this simple fact: nothing inherent in the content of religious or academic speech poses a substantially lesser risk of spreading COVID than artistic or comedic speech. If 50 random strangers may gather in the same room for a professor's lecture or a priest's sermon, then the government must permit 50 people to gather in the same room for a comedian's stand-up or an actor's monologue. When the primary difference depends on the content of the speech delivered at the gathering, there is no sufficient rationale to treat them differently. The Governor may be able in a pandemic to ban all lectures, sermons, and shows, but he crosses a constitutional red line when he bans some but permits others.

In short, the picking-and-choosing of which sectors get exemptions for their speech-based gatherings does nothing to further the government's interest. Rather, it exists for the Governor's political convenience or policy preference. And having chosen to extend it, he must recognize that other similar speakers with similar status under the First Amendment are entitled to similar treatment.

This is especially egregious when one compares the Governor's treatment of other entertainment settings. A comedian can stand in front of 99 audience members and

deliver his routine of political and cultural commentary, and as long as there is a camera in the back broadcasting his act, it is entirely legal. Jon Campbell, "Saturday Night Live wants a live audience? NY says crowd must be employees, cast," Democrat & Chronicle (Sept. 28, 2020).[3] *See Reopening New York—Media Production Guidelines.*[4] And if a comedian taped his routine and the tape was played on a movie theater's big screen, that would be legal outside New York City as long as the theater was under 25 percent capacity. *See Reopening New York—Movie Theater Guidelines.*[5] But the same routine, with the same laugh lines about our elected officials and media personalities, delivered live to an in-person audience without a camera in the back is a $15,000 fine. *See* Executive Order No. 202.68 (Oct. 6, 2020). [6] *See also Reopening New York—Low-Risk Indoor Arts & Entertainment Guidelines*[7] (permitting indoor institutions where patrons circulate through, such as "indoor museums, historical sites, [and] aquariums," to reopen, while not permitting artistic institutions with seated patrons).

The U.S. Supreme Court warned in *Turner Broadcasting Systems*: "Regulations

---

[3] Available at https://www.democratandchronicle.com/story/news/2020/09/28/snl-live-audience-covid-restrictions/3494153001/.

[4] Available at https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/MediaProductionShortGuidance.pdf.

[5] Available at https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/Movie_Theater_Summary_Guidelines.pdf.

[6] Available at https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO202.68.pdf

[7] Available at https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/LowRiskIndoorArtsEntertainmentSummary.pdf.

that discriminate among media, or among different speakers within a single medium, often present serious First Amendment concerns." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 660 (1994). *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575 (1983), and *Arkansas Writers' Project v. Ragland*, 481 U.S. 221 (1987), both applied strict scrutiny to laws that targeted particular classes of media while exempting other classes of similar media (in one instance, only large newspapers were taxed; in the other, only small magazines were taxed). The Court struck down these laws because they "targeted a small number of speakers, and thus threatened to distort the market for ideas." *Turner Broad. Sys.*, 512 U.S. at 661. This Court should do the same here, where live-audience performances are targeted for different treatment than broadcast-audience performances or taped theater shows. If 100 people may gather in the same room for a comedy show that goes on television, the economic importance of broadcast media to New York's overall economy is not a compelling reason to stop 100 people from gathering in the same room for a show that doesn't go on television.

### III.    The Governor may not favor religious gatherings over other types of assemblies protected by the First Amendment.

This Court put its finger on the crux of an important question when it wrote in its order of December 11, "Both religion and theatre implicate the exercise of First Amendment rights, and the prioritization of religious events over secular artistic events that enjoy First Amendment free speech protection raises potentially thorny questions." ECF Doc. 42, at 4. The questions may be thorny, but the answer should

be clear: the government may not prefer religious speakers over non-religious speakers.

Even before *Roman Catholic Diocese of Brooklyn* was decided, the Governor had a preference for religious assemblies. Under the Governor's order, a church or synagogue not in a Phase 4 region may hold an indoor service at 33 percent of a room's seating capacity. *See Reopening New York—Guidelines for Religious and Funeral Services*.[8] Thus, a nondenominational church may rent a small-venue theater with a seating capacity of 144 for a service on Sunday morning with 48 congregants. But the same small-venue theater could not host an afternoon matinee or evening performance of a musical for 48 patrons. In both scenarios, the attendees are seated, singing occurs, and First Amendment-protected speech is delivered to the assembly. The *only difference* between the two assemblies is the content of the speech delivered.

The Governor may reply that it is constitutional for him to prefer religious assemblies, citing *Illinois Republican Party v. Pritzker*, 973 F.3d 760 (7th Cir. 2020). Amicus was counsel for the plaintiffs in that case, and believes it was wrongly decided and is an untrustworthy guide to this Court.

First, the Seventh Circuit failed in its duty to apply strict scrutiny to the Governor's order. In *Reed v. Town of Gilbert*, this Court held that a restriction on speech that is content-based is subject to strict scrutiny. 576 U.S. 155, 163 (2015). Laws subject to strict scrutiny are "presumptively unconstitutional," *id.*, because the

---

[8] Available at
https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/ReligiousandFuneralServicesSummaryGuidance.pdf

government must prove that its restriction is narrowly tailored to a compelling interest.

The District Court in *Illinois Republican Party* correctly concluded the governor's order in this case is a content-based restriction. *Ill. Republican Party v. Pritzker*, No. 20 C 3489, 2020 U.S. Dist. LEXIS 116383, at *16 (N.D. Ill. July 2, 2020). Therefore, "[b]ecause the exemption is a content-based restriction, this provision can only stand if it survives strict scrutiny." *Id.* at *21.

Even though this was a core holding of the court below, the Seventh Circuit failed in its duty to apply strict scrutiny to the order. At no point in its analysis of the plaintiffs' claims does the Seventh Circuit mention strict scrutiny, identify a compelling interest justifying the gatherings ban, or ask whether the ban is narrowly tailored to that interest. The entire focus of the opinion is on "the government's benign motive" for its preference for religious speech, but *Reed* makes clear these motives do not matter: "[a] law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive . . ." 576 U.S. at 165. *Accord id.* at 164-65 ("We thus have no need to consider the government's justifications or purposes for enacting the Code to determine whether it is subject to strict scrutiny . . ."); *id.* at 167 ("the First Amendment expressly targets the operation of the laws—i.e., the 'abridg[ement] of speech'—rather than merely the motives of those who enacted them.").

The Seventh Circuit's failure here is in stark contrast to the Supreme Court's most recent case applying *Reed* and to its sister circuits, all of which have applied strict

scrutiny as directed in their post-*Reed* cases. *See, e.g., Barr v. Am. Ass' n of Political Consultants*, 140 S. Ct. 2335, 2347 (2020) (plurality); *id*. at 2364 (Gorsuch, J., concurring/dissenting); *Reagan Nat'l Advert. of Austin v. City of Austin*, No. 19-50354, 2020 U.S. App. LEXIS 27276, at *26 (5th Cir. Aug. 25, 2020); *Thomas v. Bright*, 937 F.3d 721, 733 (6th Cir. 2019); *Free Speech Coal., Inc. v. Atty. Gen. United States*, 825 F.3d 149, 164 (3d Cir. 2016); *Cahaly v. Larosa*, 796 F.3d 399, 405 (4th Cir. 2015).

Second, the Seventh Circuit erred in permitting the government to "balance" multiple competing compelling interests. While defending its exemption for religion, the government offered a simple explanation for its policy. The governor said that he had a compelling interest in fighting COVID-19 but also a compelling interest in extending a special solicitude toward the free exercise of religion (one that goes beyond the minimum required by the Free Exercise Clause). *See Ill. Republican Party v. Pritzker*, 973 F.3d 760, 761 (7th Cir. 2020). Without applying the strict scrutiny test, the Seventh Circuit's opinion adopted this rationale, finding the governor's desire to extend special treatment to religion a sufficient justification to grant it the ability to gather which was denied to all others. *Id*. at 769.

If this is so, then the Town of Gilbert should have won its case by arguing that its ordinance balanced its compelling interest in aesthetics and traffic safety with a compelling interest in honoring political speech near in time to an election (even if this solicitude for political signage wasn't mandated by the Free Speech Clause). The general ordinance was justified by the first compelling interest, and the exception was justified by the second compelling interest, and the ordinance was the

government's best effort to strike a balance. That is the logic of the governor's position.

Similarly, the U.S. Government should have won *Barr* by saying it was balancing its compelling interest in preventing annoying phone calls with its compelling interest in minimizing the tax burden by collecting debts owed to the Treasury. *See Barr v. Am. Ass'n of Political Consultants*, 140 S. Ct. 2335 (2020).

As these two examples illustrate, to permit this style of analysis is to eviscerate the strict-scrutiny test. Under the Seventh Circuit's framework, the government may undermine its compelling interest in any policy for any reason that it also deems compelling enough to justify the exception it desires. Virtually any regime that is underinclusive can be justified by such an approach, which would undermine numerous precedents of the Supreme Court.

Third and finally, the Seventh Circuit's preference for religious speech over political speech is fundamentally incompatible with *Reed*. In *Reed*, the Supreme Court considered a town sign code that privileged signs with ideological messages over political messages, and signs with political messages over "temporary directional signs" that point people to, among other things, church services. 576 U.S. at 159-61. Finding the town's preference for ideological and political signs over church signs was not content neutral, the Court applied strict scrutiny, which the code flunked.

"In order to make *Reed* comparable to the case before us, we would need to postulate a Sign Code that restricted temporary directional signs for everyone except places of worship, and that left the latter free to use whatever signs they wanted."

973 F.3d at 768. The Seventh Circuit then entered on precisely this analysis: an executive order that restricted gatherings for everyone except places of worship, and that left the latter free to hold whatever religious gatherings they wanted. Without applying strict scrutiny, the court concluded that such an exception is entirely acceptable under *Reed* because "the speech that accompanies religious exercise has a privileged position under the First Amendment . . ." *Id*. at 764.

None of the Supreme Court's cases have ever held that religious speech may be treated better than other kinds of speech. The Court has routinely held that religious speech cannot be treated worse than other categories or viewpoints of speech. *See, e.g., Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819 (1995). But none have held that religious speech is so special that government may discriminate in favor of religious speech over other types of speech. Truly the Seventh Circuit had to "break new ground here." 973 F.3d at 768.

But the Seventh Circuit's new ground is really just sinking sand. The logic of *Reed* and the Supreme Court's other cases compel the conclusion that religious speakers cannot be preferred over other types of speakers when making pure policy choices. *Reed* makes clear: "laws favoring some speakers over others demand strict scrutiny . . ." 576 U.S. at 170. Here the government has a compelling interest in combatting COVID-19.

But the governor's exemption for religious gatherings undermines, rather than supports, this interest. "A law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction on truthful speech, when it leaves

14

appreciable damage to that supposedly vital interest unprohibited." *Reed*, 576 U.S. at 172 (quoting *Republican Party of Minn. v. White*, 536 U.S. 765, 780 (2002)). The religion exemption does do appreciable damage to the government's interest in fighting COVID; a Centers for Disease Control report lists churches and church choirs alongside hospitals and nursing homes as sites of high transmission rates. Allison James, et al., "High COVID-19 Attack Rate Among Attendees at Events at a Church — Arkansas, March 2020," Morbidity and Mortality Weekly Report (May 22, 2020).[9] The New York Times has reported, "new outbreaks of the coronavirus are surging through churches across the country where services have resumed." Kate Conger, et al., "Churches Were Eager to Reopen. Now They Are Confronting Coronavirus Cases." N.Y. TIMES (July 10, 2020).[10]  That allowing religious services to resume may well be worth the price of an uptick in cases, but that policy judgment doesn't change the fact that the governor's exemption substantially undermines his asserted compelling interest.

Thus, all the governor can claim is that he is balancing competing compelling interests in fighting COVID while going above-and-beyond to honor religious exercise. That may be a benign motive for his exemption, but it opens the door to justifying countless exemptions as justifying by competing compelling interests. As is explained above, allowing this sort of analysis framework will end the strict scrutiny test as we know it.

---

[9] Available at https://www.cdc.gov/mmwr/volumes/69/wr/mm6920e2.htm.
[10] Available at https://www.nytimes.com/2020/07/08/us/coronavirus-churches-outbreaks.html.

The Seventh Circuit concludes this section of its opinion by saying, "*Reed* therefore does not compel the Governor to treat all gatherings alike, whether they be of Catholics, Lutherans, Orthodox Jews, Republicans, Democrats, University of Illinois alumni, Chicago Bears fans, or others." 973 F.3d at 769-70.   This flies in the face of *Reed*. Nothing in *Reed's* analysis depended on the fact that Pastor Reed sought to put up a sign for a specifically religious event. Had a Cub Scout troop sued seeking to put up a sign rather than a church, the outcome would have been exactly the same.

The Constitution commands that "entities of similar character" are entitled to similar treatment. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 48 (1983). The Governor's Order fails that promise of equal protection by extending its beneficence to some constitutional characters, like priests and professors, and even to some actors and comedians, while denying it to other actors and comedians, such as Plaintiffs.

**IV.     The Governor may not use *Jacobson* to justify unequal treatment.**

Since the COVID-19 pandemic began, courts have struggled with how to reconcile a century-old precedent, *Jacobson v. Massachusetts*, 197 U. S. 11 (1905), with modern tiers-of-scrutiny and other frameworks. Here, two principles, which are really two sides of the same coin, provide the path forward.

First, though an executive may constitutionally suspend the exercise of constitutional rights during a pandemic, *Jacobson*, 197 U.S. at 27–29, it does not follow that he may pick-and-choose who gets exemptions to that suspension based on the content of their speech. *Jacobson* only allows treating dissimilar gatherings differently. *See S. Bay United Pentecostal Church v. Newsom,* 140 S. Ct. 1613, 1613

(2020) (Roberts, C.J., concurring) (the governor's order barring church gatherings treated "comparable secular gatherings" the same and treated "only dissimilar activities" differently).

*Jacobson* is not such an open-ended warrant of unlimited, unfettered discretion that a court must sit idly by if the Governor permitted Catholics to gather but barred Lutherans from doing so, or that he allowed Democratic rallies but not Republican ones. In fact, at a time when the executive wields the greatest power, courts should be especially vigilant to ensure that power is applied fairly for the good of all, and especially skeptical of exemptions granted only to a chosen few. *Jacobson* grants tremendous power to the executive in a crisis. But that power does not include the right to discriminate on a non-medical basis in the exercise of constitutional rights. *See Trump v. Hawaii*, 138 S. Ct. 2392, 2423 (2018) (even during a crisis like World War II, discrimination "solely and explicitly on the basis of race[ ] is objectively unlawful."). If he cannot discriminate between Catholics and Lutherans, he may not discriminate between broadcast comedians and in-person-audience comedians as long as both follow the same rule (say, the 100-person cap).

Second, it is important to remember the context in which *Jacobson* arose: universal vaccination to stop the spread of smallpox. The health regulation at issue in that case would have been severely undermined by any exceptions. In fact, the Court dedicates a paragraph to the question of exceptions. Massachusetts' vaccination regulation made "an exception in favor of children certified by a registered physician to be unfit subjects for vaccination, [but] makes no exception in

17

the case of adults in like condition." *Jacobson*, 197 U.S. at 30. The Court upheld this distinction, reasoning, "this cannot be deemed a denial of the equal protection of the laws to adults; for the statute is applicable equally to all in like condition and there are obviously reasons why regulations may be appropriate for adults which could not be safely applied to persons of tender years." *Id.* Though the Court did not use the terminology at the time, we would today call this a question of tailoring. In *Jacobson*, the Court decided that children were sufficiently different from adults to justify an exception for one category of persons but not the other. Had the Massachusetts statute exempted one group of politically powerful adults, no doubt the Court would have come out differently. Here, there is no compelling reason, medical or otherwise, to treat actors' speech different from professors' speech, or broadcast comedy speech different from non-broadcast comedy speech, so the difference in treatment cannot be sustained even under *Jacobson*.

This Court should join the Sixth Circuit in its conclusion that events that follow "the same risk-minimizing precautions as similar . . . activities" permit no greater harm to others than the Governor already allows, and "treatment of similarly situated entities in comparable ways serves public health interests at the same time it preserves bedrock [constitutional] guarantees." *Roberts v. Neace*, 958 F.3d 409, 416 (6th Cir. 2020).

## CONCLUSION

Judge Ho's concurring opinion in *Spell v. Edwards*, 962 F.3d 175, 183 (5th Cir. 2020) is an apt coda to this case: "Government does not have carte blanche, even in a pandemic, to pick and choose which First Amendment rights are 'open' and which

remain 'closed.' . . . The First Amendment does not allow our leaders to decide which rights to honor and which to ignore. In law, as in life, what's good for the goose is good for the gander. In these troubled times, nothing should unify the American people more than the principle that freedom for me, but not for thee, has no place under our Constitution." Freedom for priests and professors and broadcast actors and comedians must include freedom for Plaintiffs as well under the same set of rules.

Dated: January 8, 2021                          Respectfully Submitted,

By:    /s/ Daniel R. Suhr

Daniel R. Suhr
Jeffrey M. Schwab
Liberty Justice Center
208 S. LaSalle St., Ste. 1690
Chicago, IL 60604
Telephone 312-637-2280
dsuhr@libertyjusticecenter.org
jschwab@libertyjusticecenter.org
*Attorneys for Amicus*